UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JACQUELINE HAMILTON,    )
              )
     Plaintiff,     )
              )
              )
    vs.       )   Case No. 4:09CV00991 AGF
              )
              )
MICHAEL J. ASTRUE,    )
Commissioner of Social Security,  )
              )
      Defendant.   )

## MEMORANDUM AND ORDER

   This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Jacqueline Hamilton was not

disabled and, thus, not entitled to disability insurance benefits under Title II of the Social

Security Act, 42 U.S.C. §§ 401-434, or supplemental security income ("SSI") under Title

XVI of the Act, 42 U.S.C. §§ 1381-1383f.  For the reasons set forth below, the decision

of the Commissioner shall be affirmed.

   Plaintiff, who was born on November 19, 1962, previously filed for disability

insurance benefits and SSI on December 7, 1999, alleging a disability onset date of

December 1, 1999.  Those applications were denied on January 6, 2000, and were not

pursued any further.  They are administratively final and res judicata.  Plaintiff again

applied for disability benefits and SSI on January 4, 2006, alleging a disability onset date

of June 1, 2005, at age 42, due to multiple sclerosis ("MS") and an anxiety disorder.

After Plaintiff's current application was denied at the initial administrative level, she requested a hearing before an Administrative Law Judge ("ALJ") and such hearing was held on January 30, 2007. The ALJ later obtained additional evidence from interrogatories completed by a vocational expert ("VE"). By decision dated August 15, 2007, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with limitations for jobs available in the national and local economy. Therefore, the ALJ found that Plaintiff was not disabled under the Social Security Act. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on May 21, 2009. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole. Essentially, Plaintiff argues that the ALJ erred in (1) failing to properly consider Plaintiff's credibility, (2) failing to give proper weight to the opinion of the state agency psychological consultant, and to incorporate that opinion into the hypothetical posed to the VE, (3) failing to recontact Plaintiffs treating physicians, and (4) failing to give the Plaintiff a proper opportunity to address and examine the testimony of the VE. Plaintiff asks this Court to remand the case to the Commissioner with instructions to pay Plaintiff benefits, or alternatively, with instructions to reconsider Plaintiff's claim.

**BACKGROUND**

**Work History and Application Forms**

Plaintiff represented on her application that she worked as a certified nursing assistant ("CNA") for St. Joseph's Hospital in Kirkwood, Missouri, from March 24, 2002 to December 2, 2005.  In this position, she worked on average 36 hours per week, with a starting pay of $11.18 per hour and an ending pay of $14.10 per hour.  (Tr. 148-57.) Plaintiff stated that her job duties included providing patient care by giving baths and meals to patients, receiving patients right after surgery and hooking them up to the proper machines, and taking frequent vitals of patients.  (Tr. 159.)  She noted that her job required her to move patients and machines, and that she had frequently lifted items that were 100 pounds or more.  Id.  According to the Disability Report, Plaintiff did not work in June and July 2005, her work schedule changed in August 2005, and her hours decreased in November 2005.  Plaintiff also stated that she missed "a lot of days of work" due to her medical condition from June 2005 to December 2005.  Plaintiff stopped working on December 8, 2005, because she could not do her job.  (Tr. 176.)

Prior to working at St. Joseph's Hospital, Plaintiff had worked continuously as a CNA for a number of health care agencies since 1985.  (Tr. 158.)  Plaintiff described her duties and weight lifting requirements at these jobs as being the same as those required in her position at St. Joseph's Hospital.  (Tr. 160-65.)

## Medical History

On June 15, 2005, Plaintiff was admitted to Christian Hospital as a "short stay" after complaining of chest pressure. Plaintiff also stated that she had been experiencing a tingling feeling in her right arm, the right side of her body, and the right side of her back, for three or four days, and on her way to the hospital she experienced weakness in her legs. Her physical exam was unremarkable. Her muscle strength in all of her extremities was symmetrical and appropriate. Her lab tests were unremarkable. An abdominal CT scan was negative, as was a CT scan of her head. She was released with a diagnosis of nonspecific chest discomfort, possible gastroesophageal reflux disease plus irritable bowel syndrome, and a slightly elevated white blood cell count which was possibly related to bronchitis as a result of her smoking. (Tr. 254-55.)

On June 19, 2005, Leslie B. Robinson, M.D., noted that Plaintiff had presented with chest pain at DePaul Hospital. Dr. Robinson noted that Plaintiff had been hospitalized the prior week for similar complaints and that Plaintiff was in hysterics in the emergency room. Ativan and nitroglycerin had relieved Plaintiff's pain. (Tr. 249.)

On June 27, 2005, Plaintiff saw Sundeep Das, M.D., a cardiologist, for "constant" chest pain, and pain in her left arm and wrist. Plaintiff reported that her pain increased when she slept, but decreased when she took Xanax. She also complained of palpitations, which she learned to control by taking deep breaths to calm herself down. Upon exam, Dr. Das noted that Plaintiff appeared to be "well developed nutritionally" and in no apparent distress. She was "well groomed" with "normal" body habitus. She was alert

and oriented, her mood and affect were normal, and her exam was otherwise unremarkable. Dr. Das diagnosed Plaintiff with left arm pain, etiology uncertain, but he noted that it was unlikely to be coronary artery disease; palpitations, but noted that her event monitor had been negative; "possible anxiety," because her symptoms were relieved with Xanax; and a history of tobacco use. Dr. Das urged Plaintiff to see a neurologist. (Tr. 218-19.)

On July 6, 2005, an MRI of Plaintiff's cervical spine revealed abnormal signal intensity within the cervical spinal cord from approximately the mid-C2 through mid-C4 level involving the left anterior aspect of the cervical spinal cord. The diagnostic report noted that the signal intensity was not associated with either significant expansion of the cord or volume loss, but most likely represented an acute to subacute area of demyelination or myelitis which may have been of ischemic, infectious, or other etiology. In addition, mild discogenic degenerative disease was present at C4-5 and C5-6, accompanied by left neural foraminal narrowing at C4-5. (Tr. 241-42.)

On July 7, 2005, Plaintiff saw Dr. Das with continued chest and left shoulder pain, but her symptoms had "switched to the right side," including numbness and tingling in her right arm and right leg. Dr. Das noted that Plaintiff's chest pains were "atypical," but her EKG and stress test were negative. An MRI of her cervical spine showed "changes suspicious for MS." Dr. Das diagnosed Plaintiff with possible MS involving the cervical spinal cord causing arm symptoms; palpitations, but her event monitor had been negative; a history of tobacco use; and possible anxiety. (Tr. 216-17.)

On July 13, 2005, Plaintiff saw Duane Turpin, D.O., a neurologist. Plaintiff presented with a history of pain and numbness on the right side of her body for the past month, which had begun in the right upper extremity in March, after the placement of an IV. Plaintiff indicated that the numbness had incorporated the right upper and lower extremity bilaterally, but was worse on the right. Plaintiff also had spasms in the right lower extremity. Mild cephalgia had been noted. Plaintiff denied any vision problems or weakness. Dr. Turpin noted neck pain on the right side. He noted that her cervical spine MRI showed one lesion, which appeared to be an "excellent characterization of transverse myelitis." Plaintiff's physical exam and neurological assessment were unremarkable. Dr. Turpin's impression was transverse myelitis at the cervical cord with the Marcus-Gunn pupil on the right. He noted that he was concerned about a central nervous system demyelinating disorder, ordered an MRI of the brain, and offered Plaintiff a short course of steroids for the pain and discomfort that accompanied transverse myelitis. (Tr. 232-33.)

On July 16, 2005, an MRI of Plaintiff's brain revealed several small areas of signal abnormality within the corpus callosum in the midline and within the white matter tracks of the left hemisphere. This combination of findings was consistent with the patient's clinical diagnosis of MS. (Tr. 240.)

On July 22, 2005, Plaintiff returned to Dr. Turpin for the results of the July 16, 2005 MRI. Dr. Turpin noted that Plaintiff was unable to tolerate Neurontin because of nausea, she had finished the prednisone, and she was taking Tylenol for her pain. Her

exam was stable and Dr. Turpin diagnosed Plaintiff with MS.  He also prescribed Xanax.

(Tr. 231.)  On August 22, 2005, Dr. Turpin noted that Plaintiff was getting Rebif

injections three times a week.  He also noted that Plaintiff was doing "ok," but was

having bad headaches every day due to stress.  (Tr. 230.)

On November 10, 2005, Plaintiff saw Marc Howard, M.D., complaining of left ear

pain and localized swelling.  Dr. Howard noted that Plaintiff had presumptive MS, which

was being followed by Dr. Turpin.  He also noted that a recent brain MRI revealed small

areas of signal abnormality, as did an MRI of the cervical spine.  He noted that Plaintiff

had recently been prescribed Xanax to relieve her periodic tachycardia, and had recently

begun Rebif injections.  Plaintiff had been warned about possible immunosuppression,

but continued to smoke.  Dr. Howard diagnosed a left ear infection, periodic tachycardia

due to anxiety, and MS.  Dr. Howard noted that because Plaintiff was receiving Rebif

injections, she would continue to have her liver function and thyroid function monitored.

(Tr. 245.)  On December 12, 2005, Plaintiff saw Dr. Turpin, who noted that Plaintiff was

having a lot of pain that seemed to have been getting worse over the past three months,

was having more muscle spasms, and was suffering from fatigue and insomnia.  (Tr. 229.)

On January 21, 2006, Plaintiff completed a Function Report on herself.  Plaintiff

reported that she was sore in the morning and got tired easily.  Her right leg was "always

jumping" because of spasms.  Plaintiff's personal care took longer because she got tired

and had to take her time.  She reported that she cooked complete meals, went to the store

once or twice a week, and did housework, including laundry and ironing, on a daily basis.

She was able to drive, and did so on a daily basis, unless she had taken pain medications. Her family came over more often than before, but she also went out to the movies or dinner. She also attended church and visited her aunt in the nursing home each week. Plaintiff reported that her condition affected her physical abilities, depending on how strenuous the task was that she attempted. She did not do well with stress, and therefore was taking Xanax. She also reported crying a lot because she did not know what was going to happen to her with MS. (Tr. 138-47.)

On January 27, 2006, Dr. Turpin noted increased anxiety attacks, heart racing, depression, fatigue and insomnia. Dr. Turpin noted that Plaintiff was "feeling sorry for herself," and not attending church. Her MS was noted as "stable." He prescribed Wellbutrin for her depression, as well as a pain medication, and resumed another medication for Plaintiff's fatigue. (Tr. 228.)

On February 7, 2006, Plaintiff completed a second Function Report on herself, with answers almost identical to those in her January 21, 2006 Report. (Tr. 130-37.)

On March 6, 2006, a non-examining state-agency consultant, D. Muckerman McCall, completed a Physical RFC Assessment, based upon a review of the record. The consultant indicated that Plaintiff could lift 10 pounds both occasionally and frequently, stand and/or walk for at least two hours in an eight-hour workday with normal breaks, and sit for six hours in an eight-hour workday with normal breaks. The form indicated that Plaintiff's ability to push and/or pull within those limitations was limited in the upper extremities; that she could occasionally climb, balance, stoop, kneel, crouch, or crawl.

The consultant indicated that Plaintiff had no visual or communicative restrictions, had limited manipulative limitations in reaching all directions, and should avoid moderate exposure to extreme heat, and concentrated exposure to hazards. The consultant signed his name in the box calling for the signature of a "medical consultant," but there is no indication, such as an "M.D." following his name, that he was a medical source. (Tr. 122-29.)

On March 20, 2006, a non-examining state-agency consultant, Sherry Bassi, Ph.D., completed a Mental RFC Assessment, based upon a review of the record. She opined that Plaintiff had moderate limitations in the following work-related abilities: understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; and completing a normal workday and workweek without interruptions from psychologically-based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. (Tr. 104-05.) On the same date, Dr. Bassi concluded in a Functional Capacity Assessment that Plaintiff could "follow simple directions and make basic work-related decisions. She can relate adequately to peers and supervisors. She can adapt to routine changes in a work environment." (Tr. 106.) Dr. Bassi opined that Plaintiff had moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace; and a mild limitation in activities of daily living. (Tr. 118.)

On July 10, 2006, Dr. Turpin confirmed Plaintiff's prescriptions for Rebif injections for MS and Wellbutrin for depression. (Tr. 227.)

On August 10, 2006, Aqeeb Ahmad, M.D., diagnosed Plaintiff with major depression and MS. He noted that Plaintiff had been diagnosed with MS in 2005 and had not worked since December 2005. He confirmed her Rebif injections and noted that she was quite anxious. He noted that Plaintiff had been on Wellbutrin and it was helping, but Walgreens would not fill the prescription, and she had subsequently been prescribed Xanax. He prescribed her Wellbutrin three times a day, and Xanax. (Tr. 222.) In a follow-up appointment on August 31, 2006, Plaintiff complained of panic attacks, palpitations, dizziness, hyperventilation, and crying spells. Dr. Ahmad noted that Plaintiff had just started taking Wellbutrin three times a day. She was also on a 30 day heart monitor after seeing a cardiologist. Dr. Ahmad diagnosed Plaintiff with panic disorder, major depression, and MS. He prescribed Zoloft, continued Plaintiff's Wellbutrin and Xanax prescriptions, and discontinued Plaintiff's Paxil prescription. (Tr. 221.)

On September 7, 2006, Usman Qayyum, M.D., of St. Louis Heart and Vascular, noted that Plaintiff tested positive for palpitations, and she "demonstrate[d] sinus tachycardia on occasion." Dr. Qayyum diagnosed her with a history of tobacco use, MS, and anxiety. He noted that because Plaintiff "only had sinus tachycardia on the event monitor," he chose to allow the Wellbutrin to take effect before prescribing Toprol XL. (Tr. 214-15.) On November 2, 2006, Dr. Qayyum noted that Plaintiff had been on

Wellbutrin for some time and that her anxiety attacks had "decreased substantially," but she continued to have them a "few times a month." Dr. Qayyum continued the Wellbutrin and started Plaintiff on Toprol to "take the edge off." (Tr. 211-12.)

On November 10, 2006, Plaintiff was seen by Brian Sommerville, M.D., a neurologist. She complained of recurrent left-sided episodes of a burning sensation in her left arm and leg, occurring "multiple times per day" for one to two minutes. She reported that her left arm was weaker, she had trouble lifting groceries, her walking was "goofy" and did not "feel right," and she was stumbling and "unsteady." She also reported that she was moody and had crying spells, had blurry vision, but no vision loss or eye pain, and had bladder urgency. She was able to enjoy some activities, like going to a casino boat. Plaintiff told Dr. Sommerville that she had been calling an ambulance "frequently" for panic attacks, although the calls were decreasing in frequency. Plaintiff's problem list included relapsing and remitting MS, depression, panic attacks, and "psychosocial stress - unemployment." On exam, Dr. Sommerville noted that Plaintiff's motor strength was full and equal, there was a slight change in the right lower extremity, her gait was slow and antalgic, and her tandem walk of eight steps was slow, but steady. Dr. Sommerville diagnosed Plaintiff with MS, scheduled an MRI so he could determine whether to switch Plaintiff from Rebif to another interferon, and started her on a new medication for her insomnia and pain. (Tr. 203-04.)

On April 16, 2007, Plaintiff saw Dr. Sommerville for a follow-up visit. Dr. Sommerville noted that Plaintiff had MS with minimal disability, but significant

neuropathic pain, which was her major complaint.  By clinical and imaging criteria, her disease had been stable on Rebif for one year.  Dr. Sommerville noted that at her last visit, her amitriptyline dosage was increased, but she experienced too much sedation and had discontinued it entirely.  Since then, her symptoms had worsened.  Plaintiff complained of left-sided paresthesias in her arm, shoulder, and chest.  She continued to have episodes of tachycardia and panic attacks.  She had recently been taken to the emergency room during an episode.  She had been evaluated for cardiac issues in the past, but the workups had been unremarkable.  She continued to call emergency services for this complaint, but also responded to Ativan during these episodes.  Dr. Sommerville noted that Plaintiff was scheduled for another stress test and echocardiogram.  Plaintiff also reported numerous stressors in her life.  Plaintiff complained that her left arm "got weak," she had some bladder urgency, had problems with short-term memory, and was worse at handling her financial affairs.  She reported that her pain was at a five on a ten point scale.  (Tr. 197.)

Plaintiff's physical and mental exams were unremarkable.  Dr. Sommerville assessed Plaintiff as having MS and a normal exam, which was unchanged.  He also noted that she had experienced a worsening of her paresthesias following her self-discontinuation of amitriptyline.  Dr. Sommerville continued Plaintiff's Rebif regimen, and restarted her amitriptyline at a lower dosage.  (Tr. 197-98.)

In a May 10, 2007 statement, Plaintiff's father indicated that he frequently talked to Plaintiff on the telephone, and that he witnessed emergency hospital visits because of

her problems related to MS. (Tr. 85.) In a May 11, 2007 letter, the mother of Plaintiff's nephew indicated that, prior to Plaintiff's diagnosis, Plaintiff had very actively participated in her nephew's daily life, babysitting him and playing with him, but that Plaintiff could no longer play with him. (Tr. 84.)

On May 30, 2007, Plaintiff was evaluated for a prosthetic flex footplate prescribed by Dr. Sommerville to treat left foot drop due to MS. (Tr. 192.) On June 15, 2007, she received the prosthetic and was satisfied. (Tr. 188.)

An undated statement from one of Plaintiff's sisters indicated that Plaintiff was tired all the time, was frequently in pain, and had been rushed to the hospital on several occasions for her blood pressure and anxiety attacks. (Tr. 82.) An undated statement from Plaintiff's older sister indicated that Plaintiff was very weak, and could not walk for very long or lift things; her emotions were "all over the place"; she had panic attacks, and was in and out of the hospital; and she could no longer help take care of her mother, as she had in the past. (Tr. 81.) According to an undated statement from Plaintiff's daughter, Plaintiff called emergency services because of panic attacks or MS symptoms, her mind had been infected with forgetfulness and mood swings, she had lost her house and car because she could not work, she could not do anything, she could not sit for very long, her nerves were bad, and she was impatient. (Tr. 79-80.)

**Evidentiary Hearing of January 30, 2007 (Tr. 256-66)**

Plaintiff, who was represented by counsel, testified that she was single and lived at home with her 18 year-old daughter and her friend. She also had a 26 year-old child.

Plaintiff testified that although she had a driver's license, her mother had driven her to the hearing. Plaintiff testified that she graduated in 2002 with an associate's degree in applied science.

Plaintiff testified that her last day of work was on or about December 1, 2005. At that time, she was working for St. Joseph Hospital in Kirkwood as a "sec tech, like a CNA," and she also did some secretarial work for the hospital. She stated that she stopped working because she could no longer do her job. Plaintiff testified that she would go to work and get sent home early because she hurt "so bad," and that the hospital kept trying to redo her schedule. She testified that on her last day of employment, she tried going to work, but realized that she was no longer capable. Plaintiff testified that the specific symptoms that prevented her from continuing to work in December 2005 included lack of sleep due to pain, pain in her neck and arms that was "pretty bad," spasms, and numbness in her fingers.

Plaintiff testified that she currently experienced the same pain she had when she quit working, but in addition, her left side kept "giving out" on her. She described it as a burning sensation and a pain. She also got tired quickly. Plaintiff testified that she could barely shop for groceries or "lift," and even with pain medication, she did not get any sleep. Plaintiff testified that she took Elavil for nighttime pain, and sometimes took Pamelor for daytime pain. She also testified that she took Naprosyn for abdominal pain and cramps caused by the injections she had been receiving three times a week since August of 2005.

Upon examination by her counsel, Plaintiff testified that her arms, entire left side, and calves of her legs were hurting.  She stated that although she could generally pick things up, there were bad days when she would accidentally drop things.  She could lift her groceries, but stated that after doing so she "hurts."  Plaintiff testified that her neurologist told her not to lift anything that weighed more than ten pounds.

Plaintiff testified that she got tired quickly from walking, making her bed, cleaning up her room, and walking up steps.  She stated that she could bend at the waist, but that she sometimes experienced pain around her waist and legs from sitting.  Plaintiff testified that she was sleeping no more than four or five hours each night because of the pain, and sometimes, in the middle of the night, she had to take a second Elavil to help her fall back to sleep.

Plaintiff testified that her memory was getting to the point where her daughter had to help her.  She had trouble counting money and was forgetting to pay the bills.  Plaintiff testified that her doctors told her that her MS was incurable and that her muscles were going to degenerate and she might become blind.

**Post-Hearing Evidence (Tr. 86-90)**

After the hearing, the ALJ sent interrogatories to Susan Shea, a VE.  In her response to the interrogatories, dated April 12, 2007, the VE testified that according to the Dictionary of Occupational Titles ("DOT"), Plaintiff's job as a CNA was a semi-skilled job at the medium exertional work level; however, the VE opined that the job was at the heavy exertional work level as performed by Plaintiff.  The VE testified that there were

no jobs to which Plaintiff's skills from her past work would transfer.

The VE testified that an individual who could lift and carry ten pounds occasionally, stand and/or walk for a total of two hours in an eight-hour workday with normal breaks, and sit for six hours in an eight-hour workday with normal breaks, could not perform Plaintiff's past job because the hypothetical individual could only perform at the sedentary work level. However, the VE testified that the hypothetical individual could perform sedentary assembly work jobs, sedentary machine work jobs, or could work as a receptionist and appointment maker. The VE testified that each of those jobs was available in both the local and national economies.

**ALJ's Decision of August 15, 2007 (Tr. 15-25)**

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010, and had not engaged in substantial gainful activity at any time relevant to the decision. He then found that she suffered from the severe impairments of MS and anxiety disorder. He found, however, that neither of these impairments, singly or in combination, met or equaled a deemed-disabling impairment listed in the Commissioner's regulations, 20 C.F.R. § 404, Pt. 404, Subpt. P, App. 1 ("Appendix 1").

The ALJ then proceeded to find that Plaintiff possessed the RFC to occasionally lift ten pounds, sit a majority of the work day with some walking and/or standing, and perform repetitive hand-finger actions. The ALJ stated that Plaintiff had mild restrictions in activities of daily living, but no difficulties in maintaining social functioning,

concentrating, persistence, or pace. The ALJ also found no episodes of decompensation.

Citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), as setting forth the relevant factors in evaluating the credibility of a claimant's allegations, the ALJ found that while he found that Plaintiff's medically determinable impairments could reasonably be expected to cause some symptoms, her statements concerning the intensity, persistence and limiting effects of these symptoms were "not entirely supported" by the record. The ALJ found that Plaintiff's symptoms were "variable," that objective examinations showed little reduction in function, that Plaintiff's strength had not diminished, and that there was no evidence of muscle atrophy. The ALJ observed that Plaintiff had completed two lengthy function reports, a work activity report, and a medication list without assistance.

The ALJ referenced Dr. Sommerville's January 2007 notes, which stated that Plaintiff's MS caused "minimal disability" and had been stable on Rebif for over one year, and that her physical and neurological exam was unremarkable and unchanged. The ALJ stated that none of Plaintiff's physicians had found any significant, long-term, or repetitive limitations, and that none of her treating doctors had stated that her activities were restricted or that Plaintiff was unable to work.

The ALJ noted that except for Plaintiff's emergency room visit in June 2005 and an emergency room visit referenced in Dr. Robinson's notes, there was no medical evidence that supported Plaintiff's allegations or the statements made by Plaintiff's father, sisters, and daughter regarding frequent calls for emergency services or emergency room visits.

The ALJ referenced the report of Dr. Bassi, the non-examining state agency psychologist, which stated that Plaintiff had moderate limitations in social functioning, and concentration, persistence, and pace, but provided no objective evidence of limitations in Plaintiff's social functioning. The ALJ stated that although Plaintiff took prescription medications, there was no evidence that they were ineffective or resulted in severe side effects. The ALJ added that Plaintiff had stopped taking her medication "on her own," with increased symptoms as a result. The ALJ further found that Plaintiff's allegations of disabling and debilitating impairments were not supported by the medical record. The ALJ referred back to Dr. Sommerville's notes from April 2007, where he noted that Plaintiff had good repetition, normal recall, and could recite the months backward without difficulty. Moreover, in her function report, Plaintiff stated that she went out to eat or to the movies with her family, saw family and friends frequently, and tried to get out at least twice a week. The ALJ found that nothing in Plaintiff's statements or medical evidence fully supported her own allegations of disability.

The ALJ found that Plaintiff was unable to perform any past relevant work, specifically as a CNA, because such work was generally defined as medium exertional level work, and Plaintiff was limited to no more than sedentary work. The ALJ concluded that, based on Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including sedentary assembly work, sedentary machine work, and work as a receptionist or appointment maker. Therefore, the ALJ found that Plaintiff was not

disabled as defined by the Social Security Act.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision;'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

> It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo. If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits.

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. Jan. 2009) (citations omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a

medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Barnhart v. Walton</u>,  535 U.S. 212, 217-22 (2002).  The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).  A special technique is used to determine the severity of mental disorders.  This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  <u>Id.</u> § 404.1520a(c)(3).

If the claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the claim is denied.  If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulation, 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, the claimant is conclusively presumed to be disabled.  Otherwise, the Commissioner asks at step four whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work, if any.  If the claimant can return to past relevant work, the claimant is not disabled.  Otherwise, the burden of proof shifts at step five to the

Commissioner to demonstrate that the claimant has the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Commissioner's Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment.  Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments such as depression, the Commissioner cannot carry the step-five burden by relying on the Guidelines, but must consider testimony of a vocational expert ("VE") as to the availability of jobs that a person with the claimant's profile could perform.  Baker v. Barnhart, 457 F.3d 882, 888 n.2, 894-95 (8th Cir. 2006).

**Credibility Assessment**

Plaintiff argues that the ALJ improperly assessed her credibility when he wrote, "It is specifically noted that the claimant completed two lengthy function reports, a work activity report, and a medication list without assistance."  (Tr. 22-A.)  In Polaski, 739 F.2d at 1322, the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints."  An ALJ

must also consider observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Id. "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." Donahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).

Here, the Court concludes that the record supports the ALJ's finding that Plaintiff's subjective complaints were not fully credible. Plaintiff's physical and neurological examinations were generally unremarkable, and the record contained no evidence of muscle atrophy or diminished strength. (Tr. 22-A, 23, 197-98, 211-12, 231-33, 254.) In January 2006, Dr. Turpin noted that Plaintiff's MS was stable. (Tr. 228.) Similarly, in April 2007, Dr. Sommerville noted that Plaintiff had only minimal disability from MS and that Plaintiff's MS had been stable on Rebif injections for over one year. (Tr. 22-A, 197.) While ability to complete three work-related forms provides no evidence of her ability to complete an eight-hour workday, five days a week, this fact did not stand alone in the ALJ's determination. The ALJ also relied upon the opinions of her treating physicians, none of whom noted any significant, long-term, or repetitive limitations, or opined that Plaintiff was unable to work. Accordingly, this Court finds that the record supports the ALJ's decision to discount Plaintiff's credibility.

## Plaintiff's Treating Physicians

Plaintiff argues that the ALJ had a duty to recontact Plaintiff's treating physicians to request information on Plaintiff's ability to perform work-related functions. The ALJ is required to recontact medical sources only if the available evidence does not provide an adequate basis for determining the merits of the disability claim. Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). The ALJ is not required to contact a physician whenever the ALJ rejects that physician's opinion. Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006). Here, the Court does not believe that the ALJ was under an obligation to recontact Plaintiff's treating physicians. Plaintiff does not explain how recontacting them would help her case. See Land v. Astrue, No. 4:08CV01354 FRB, 2009 WL 3164077, at *19 n.33 (E.D. Mo. Sept. 25, 2009) (finding no error in ALJ's failure to recontact the plaintiff's physician where the plaintiff did not explain how any new evidence would have affected the ALJ's decision). In sum, the Court cannot say that the ALJ erred in failing to recontact Plaintiff's treating physicians, and therefore, the ALJ properly considered the lack of restrictions imposed by Plaintiff's treating physicians in discounting Plaintiff's credibility.

## Third-Party Statements

Plaintiff argues that the ALJ improperly evaluated the third-party witness statements submitted by Plaintiff's daughter, sisters, father, and nephew's mother. Specifically, the Plaintiff challenges the ALJ's statement that:

> The undersigned considered the witness statements. However, it must be kept in mind that none of them are physicians or vocational experts. They

do not have the expertise to determine whether the claimant can work. As family members, they could be motivated to help the claimant obtain benefits. (Tr. 22-A.)

Plaintiff alleges that the ALJ erred by failing to use the guidelines set out in Social Security Ruling ("SSR") 06-03p, section I, entitled "Explanation of the Consideration Given to Opinions from 'Other Sources.'" 2006 WL 2329939, *6 (August 9, 2006). Plaintiff's reliance on SSR 06-03p is misplaced because "other sources" as defined in that section refers to medical sources who are not "acceptable medical sources," and "non-medical sources" who have seen the individual in their professional capacity. Id. The third-party witnesses at issue in this case are Plaintiff's family members, who do not qualify as "other sources" per SSR 06-03p.

This Court finds support in the record for the ALJ's treatment of the third-party statements. In addition to correctly noting that the third-party witnesses were not physicians or VEs, and therefore did not have the expertise to determine whether Plaintiff could work, the ALJ noted that they had a motivation as family members to help Plaintiff obtain her benefits. In addition, the ALJ discounted their statements due to a lack of support in the record. The third-party witness statements alleged that Plaintiff made numerous calls to emergency services and visits to emergency rooms, yet the only medical evidence of record to support these allegations was a June 2005 emergency visit and a reference to another emergency room visit in Dr. Robinson's notes.

Moreover, the witness statements essentially corroborated Plaintiff's testimony and reiterated Plaintiff's subjective complaints. (Tr. 22-22-A.) The Eighth Circuit has

held that where the same evidence that supports discounting Plaintiff's testimony also supports discounting the testimony of a third-party, "specific articulation of credibility findings is preferable," but the lack thereof "does not require reversal because the ultimate finding is supported by substantial evidence in the record." Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

Accordingly, this Court finds that the ALJ properly discounted the third-party witnesses' credibility.

## Plaintiff's Activities of Daily Living

Plaintiff contends that the ALJ failed to properly consider Plaintiff's activities of daily living when he stated:

> In December 2006, the claimant enjoyed some of her favorite activities such as the casino boat. In her function report, the claimant stated that she saw family and friends frequently. She went out to eat with family or to the movies. She tried to get out at least twice a week. (Tr. 23.)

The record reflects that Plaintiff testified that she cooked complete meals and did housework, including laundry and ironing, on a daily basis. She testified that she drove on a daily basis, attended church almost every week, went to the store once or twice a week, and visited her aunt in a nursing home once a week. She stated that her family visited her, and that they went to movies or ate out sometimes. She also went to the casino boat. She stated that she tried to get out of her home at least twice a week.

The Eighth Circuit has held that activities such as watching television, doing light housework, visiting with friends, and going to church "do not indicate that a claimant is able to work full time in our competitive economy." Banks v. Massanari, 258 F.3d 820,

25

832 (8th Cir. 2001) (quoting <u>Hogg v. Shalala</u>, 45 F.3d 276, 278 (8th Cir. 1995)).

However, Plaintiff testified to regularly engaging in activities that rise above the

exertional requirements of the activities described by the Eighth Circuit.  Accordingly,

this Court finds that the ALJ properly evaluated Plaintiff's limited daily activities in his

credibility analysis.

**Opinion of Sherry Bassi, Ph.D.**

Plaintiff argues that the ALJ failed to properly consider the effects of anxiety on

Plaintiff's work-related abilities.  Specifically, Plaintiff argues that the ALJ failed to

provide adequate reasons for disregarding the opinions of Dr. Bassi.

Dr. Bassi's Functional Capacity Assessment of Plaintiff noted that Plaintiff had

moderate limitations in maintaining social functioning and maintaining concentration,

persistence, or pace; and Plaintiff had a mild limitation in activities of daily living.  (Tr.

118.)  However, in his RFC assessment, the ALJ stated that Plaintiff had "mild

restrictions in activities of daily living," but "no difficulties in maintaining social

functioning or in concentration, persistence, or pace."  (Tr. 21.)

The ALJ found that Dr. Bassi's opinion regarding Plaintiff's social functioning and

concentration, persistence, or pace was not supported by objective evidence because

while the narrative section of Dr. Bassi's Functional Capacity Assessment discussed

Plaintiff's functional limitations and minor forgetfulness, the only explanation or support

provided for the conclusion that Plaintiff had moderate limitations in maintaining social

functioning and maintaining concentration, persistence, or pace, was the cross-reference

to Dr. Bassi's Mental RFC. (Tr. 120.) However, the only explanation or support provided in the Mental RFC was Dr. Bassi's statements that Plaintiff could "follow simple directions and make basic work-related decisions," "relate adequately to peers and supervisors," and "adapt to routine changes in a work environment." (Tr. 104-06.) Therefore, the ALJ was correct in determining that there was no support for Dr. Bassi's conclusion as to Plaintiff's social functioning and concentration, persistence, or pace.

The medical records reflect that on June 27, 2005, Dr. Das noted that Plaintiff had a normal mood and affect. (Tr. 218.) On July 13, 2005, a mental status examination indicated that Plaintiff had normal logic, reasoning, insight, thought content, and fund of knowledge. (Tr. 232-33.) Medical records from June 27, 2005, August 10, 2006, and November 2, 2006, also indicate that medication helped relieve Plaintiff's anxiety. (Tr. 211, 219, 222.) Further, on November 2, 2006, Dr. Qayyum noted that Plaintiff had no complaint of anxiety and that Plaintiff's anxiety attacks had decreased "substantially" with the use of medication. (Tr. 211.) This Court finds that the record supports the ALJ's decision to disregard Dr. Bassi's opinion because it was not supported by medical evidence.

Plaintiff argues that the ALJ failed to ask the VE whether the multiple moderate limitations assessed by Dr. Bassi would affect the RFC. "[A] vocational expert need only consider impairments supported by substantial evidence in the record and accepted by the ALJ as true." Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001); see also Stormo v. Barnhart, 377 F.3d 801, 808-09 (8th Cir. 2004) (hypothetical is sufficient if it includes

impairments supported by substantial evidence and accepted as true by ALJ).  Because

the ALJ properly discounted Dr. Bassi's opinion, the ALJ was not required to include the

limitations assessed by Dr. Bassi in the hypothetical questions posed to the VE.

**Plaintiff's Rebif Injections**

Plaintiff argues that the ALJ failed to consider whether Plaintiff's Rebif injection

treatment would interfere with her ability to maintain competitive employment.   The

record indicates that Plaintiff must receive a Rebif injection three times weekly.  Plaintiff

argues that the ALJ should have determined whether Plaintiff would need to leave work

three times per week to receive her Rebif injection and, if so, how long would Plaintiff be

away from the workplace.

It is the Plaintiff's burden to demonstrate her inability to engage in any substantial

gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(1)(A);

Barnhart,  535 U.S. at 217-22.  The record reflects that the ALJ discussed medical

evidence and Plaintiff's testimony regarding Rebif injections, and the ALJ specifically

noted that medical evidence indicated that Plaintiff's MS was stable with the use of Rebif

injections.  Further, the medical evidence of record does not indicate that Plaintiff's

receipt of Rebif injections imposed any work-related limitations beyond those contained

in the RFC assessment.  This Court further notes that Plaintiff does not now argue that

she needs to leave work to receive her injections.[1]  Accordingly, the ALJ properly

---

[1]Rebif is commonly administered through a self-injection under the skin, three times a
week.  See MayoClinic.com, Interferon Beta-1a (Intramuscular Route, Subcutaneous
Route, Injection Route), available at
http://www.mayoclinic.com/health/drug-information/DR600797/

considered Plaintiff's Rebif injections and chose not to include any additional restrictions related to Rebif injections in his RFC finding, or to include any additional restrictions in the hypothetical questions posed to the VE.

**Vocational Expert**

Finally, Plaintiff argues that the ALJ failed to properly consider the VE's testimony because (1) the VE failed to provide DOT codes, as requested in the ALJ's interrogatories; (2) Plaintiff was not provided with the opportunity to ask the ALJ to lay a foundation to determine the qualifications of the VE as an expert; and (3) Plaintiff was not provided with the opportunity to cross examine the VE.

While Plaintiff correctly notes that the VE did not provide DOT identification numbers for the jobs identified, there is no requirement that a VE provide DOT identification numbers. The VE's failure to provide DOT numbers does not undermine the reliability of the VE's testimony, nor does it affect the validity of the ALJ's determination.

Plaintiff's assertions that she was not provided the opportunity to ask the ALJ to lay a foundation to determine the qualifications of the VE, nor provided the opportunity to cross examine the vocational expert, are not supported by the record. In a letter to Plaintiff's representative dated February 8, 2007, the ALJ advised Plaintiff that he intended to obtain VE testimony via interrogatories. (Tr. 52-56.) The letter included a copy of the proposed interrogatories and informed Plaintiff that she could object to any of

DSECTION=proper-use

the interrogatories, propose other interrogatories, or object to the ALJ's obtaining the information. (Tr. 52.) The record contains no response to the February 8, 2007 letter.

Further, in a letter to Plaintiff's representative dated May 2, 2007, the ALJ provided the VE's responses to the interrogatories. (Tr. 47-48.) The letter informed Plaintiff that she could submit written comments concerning the VE's responses, submit written questions to the VE, or request a supplemental hearing during which she could question the VE. (Tr. 47.) The record contains no response to the May 2, 2007 letter. Thus, the ALJ properly afforded Plaintiff the opportunity to challenge the VE's qualifications and testimony, but Plaintiff failed to do so.

## CONCLUSION

While there is evidence to support a contrary result, the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. Jan. 2009) (citation omitted). "'If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioners's findings, [the court] must affirm the denial of benefits.'" Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)). Accordingly, the Court believes that the ALJ's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 30th day of September, 2010.